**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHRISTAL DAWN SMITH,      )
                              )
          Plaintiff,      )
                              )     Civil Action No. 12-362
      v.                   )
                              )     Judge Nora Barry Fischer
MICHAEL J. ASTRUE,       )
COMMISSIONER OF        )
SOCIAL SECURITY,         )
                              )
          Defendant.    )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Christal Dawn Smith ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f ("Act"). The record has been developed at the administrative level, and the parties have brought cross-motions for summary judgment. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence. Accordingly, Plaintiff's Motion for Summary Judgment (Docket No. 8) is DENIED, and Defendant's Motion for Summary Judgment (Docket No. 10) is GRANTED.

## II.    PROCEDURAL HISTORY

Plaintiff applied for SSI on March 9, 2009, alleging both physical and mental impairments with a disability onset date of January 1, 2005. (R. at 161-167).[1] Following the initial denial of her application on August 4, 2009 (R. at 104-115), a hearing was held before an ALJ on November 17, 2010 at which Plaintiff and a vocational expert appeared and testified (R. at 41-80). The ALJ issued his unfavorable decision to Plaintiff on December 8, 2010. (R. at 21-40). Thereafter, Plaintiff filed a request for review by the Appeals Council. (R. at 14-20). The Appeals Council denied Plaintiff's request on February 10, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1-6). Having exhausted all administrative remedies, Plaintiff filed her Complaint in this court on March 26, 2012, followed by Defendant's Answer on May 31, 2012. (Docket Nos. 4, 5). Subsequently, Plaintiff moved for summary judgment with a supporting brief on June 15, 2012. (Docket Nos. 8-9). Defendant filed his cross-motion and brief in support on July 19, 2012. (Docket Nos. 10-11).

## III.   FACTS

### A. General Background

Plaintiff was born on October 1, 1978 and was thirty-two years of age at the time of her hearing.[2] (R. 48).  She resided with her fiancé in Jeannette, Pennsylvania, where Plaintiff also attended high school. (R. at 47-48). Plaintiff has a son from a previous marriage, who was ten years old at the time of the hearing. (R. at 48, 65, 73, 553).  Prior to her March 9, 2009 filing, Plaintiff had applied for disability insurance benefits ("DIB") in 2006 and SSI in 2007, but was each time denied. (R. at 98-102, 218). She was not working at the time of the hearing. (R. at 53).

Plaintiff's highest level of education is a high school degree. (R. at 48-49).   From kindergarten until completing the twelfth grade, she participated in special education, also taking

---

[1]       Citations to ECF Nos., the Record, *hereinafter*, "R. at ___."
[2]       Plaintiff is defined as a "Younger Person," an individual between the ages of 18 and 49. 20 C.F.R. §§ 404.1563, 416.963.

vocational courses in food service. (*Id*.).  Since graduating from high school in 1998, she has performed a number of unskilled, short-term and temporary jobs, including as a cashier in a grocery store and fast food restaurants. (R. at 52-53, 194, 554). Plaintiff's work history concluded in 2005 after a brief stint as a restaurant dishwasher. (*Id*.). Her daily activities primarily consisted of watching television, painting, and playing games. (R. at 67, 234, 586).

## B. Medical History

Plaintiff's medical history includes ankle and knee injury, low back pain, obesity, asthma, migraine headaches, sleep apnea, hypothyroidism, a hiatal hernia, a learning disability, and depression. (R at 261, 359-364, 420-21). In her Disability Report, Plaintiff claimed that depression, thyroid problems, a sleep disorder, a hernia, and the fact that she is a "slow learner" limit her ability to work. (R. at 222). Her medications included Perphenazine,[3] Amitryptyline,[4] Verapamil,[5] Butalbital,[6] Levothyroxine,[7] and Sertraline.[8] (R. at 260). She does not abuse alcohol, nor does she use tobacco or illicit drugs. (R. at 586, 594).

### *1. Ankle, Knee, and Back*

---

[3]     Perphenazine is classified as a conventional antipsychotic drug and is generally used to treat the symptoms of schizophrenia. It works by decreasing abnormal excitement in the brain.  PubMed Health, Perphenazine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000601/ (last visited September 12, 2012).

[4]     Amitriptyline is classified as a tricyclic antidepressant drug and is used to treat the symptoms of depression. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance. PubMed Health, Amitriptyline, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666 (last visited September 12, 2012).

[5]     Verapamil is classified as a calcium-channel blocker and is used to treat high blood pressure and to control angina (chest pain). It works by relaxing the blood vessels so the heart does not have to pump as hard. PubMed Health, Verapamil, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000818/ (last visited September 12, 2012).

[6]     "Analgesics containing butalbital compounded with aspirin, acetaminophen, and/or caffeine are widely used for the treatment of migraine and tension-type headache." PubMed Health, Butalbital in the treatment of headache, *available at* http://www.ncbi.nlm.nih.gov/pubmed/11903523 (last visited September 12, 2012).

[7]     Levothyroxine is a thyroid hormone used to treat hypothyroidism.  PubMed Health, Levothyroxine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000684/ (last visited September 12, 2012).

[8]     Sertraline is a type of anti-depressant known as a selective serotonin reuptake inhibitor (SSRI).  It is used to treat depression, obsessive-compulsive disorder, and anxiety disorders.  It works by "increasing the amounts of serotonin, a natural substance in the brain that helps maintain mental balance."  PubMed Health, Sertraline, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017/ (last visited September 12, 2012).

In October 2005, Plaintiff sustained injury to her left knee when she fell while taking out the garbage. (R. at 283, 294). However, an x-ray taken of her knee on October 21, 2005 at Mercy Jeannette Hospital did not reveal facture, dislocation, or degenerative change. (R. at 463). Thereafter, Plaintiff was treated for left knee and low back pain by Dr. Priya Prabhakar, M.D., who prescribed physical therapy and referred her to The PT Group in Jeannette, PA. (R. at 280, 285). Plaintiff appeared at The PT Group for an initial evaluation on November 23, 2005, complaining that walking, standing, and lifting were painful, yet she ambulated independently. (R. at 283, 285). She also reported sleeping "fairly well" and that she was not using any medications. (R. at 283, 285). On November 28, 2005, Plaintiff visited Mercy Jeannette Hospital for an MRI of her left knee and lower back. (R. at 285, 294, 461-62). The MRI of her knee revealed intrameniscal degenerative changes in the posterior horns of the medial meniscus,[9] and the MRI of her back showed a "very slight disc bulge" posteriorly in her lumbar spine, but no other abnormalities were present. (R. at 294, 461-62).

As Plaintiff continued physical therapy through December 2005, she reported doing "very well" and was able to perform therapeutic exercises "without difficulty," noting improvements in her back and knee. (R. at 285-89). On December 21, 2005, although still complaining of knee pain to some degree, Plaintiff reported "no pain" in her lower back and was discharged by her physical therapist after completing all twelve prescribed sessions. (R. at 289-90). In a December 22, 2005 letter to Dr. Prabhakar, her physical therapist wrote that Plaintiff had "achieved all established goals" for her low back pain, in addition to all short-term goals and half of all long-term goals for her left knee pain. (R. at 290). However, due to Plaintiff's reported

---

[9]     The meniscus is "a crescentic intraarticular fibrocartilage found in certain joints" STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

frustration with her left knee and "fairly persistent" pain, her physical therapist recommended she follow up with an orthopedic specialist. (*Id.*).

On January 9, 2006, Plaintiff was examined by Dr. George R. Hunter, a medical doctor specializing in orthopedics at Orthopedic Associates of Pittsburgh in Monroeville, PA. (R. at 294). Dr. Hunter's Office Notes referenced the history of Plaintiff's knee injury and her alleged difficulty walking because of pain. (*Id.*). He noted her left knee had a normal alignment and no effusion,[10] as well as full range of motion including full extension, but there was tenderness to the medial and lateral joint lines and palpation of the patellar tendon. (*Id.*). Dr. Hunter opined Plaintiff might have early arthritic changes in her knee and injected it with Lidocaine[11] and Depomedrol,[12] instructing her to return for reassessment if her symptoms did not "settle down." (*Id.*).

In July 2006, Plaintiff injured her left ankle joint, of which an x-ray was taken on July 17, 2006 and was normal except for a small calcaneal spur.[13] (R. at 457-58). Treatment records indicate that Plaintiff saw her primary care physician, Dr. Edgar Derek Peske, M.D., that August for pain in her left knee and ankle. (R. at 359). On November 7, 2006, Plaintiff visited Mercy Jeannette Hospital for another x-ray of her ankle, which showed evidence of soft tissue swelling and presence of a plantar calcaneal spur. (R. at 359, 457). She saw Dr. Peske for ankle pain again on December 1, 2006, at which time he referred her to a physician named Dr. Kuorul, who diagnosed her with post-taylor tendonitis on December 6, 2006. (R. at 359). However, in his

---

[10]     Effusion is the "escape of fluid from the blood vessels or lymphatics into the tissues or a cavity." STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).
[11]     Lidocaine is a local anesthetic, which "works by stopping nerves from sending pain signals." PubMed Health, Lidocaine Transdermal, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000235/ (last visited September 12, 2012).
[12]     Depo Medrol is an "anti-inflammatory glucocorticoid for intramuscular, intraarticular, soft tissue or intralesional injection." RXList, Depo Medrol, *available at* http://www.rxlist.com/depo-medrol-drug.htm (last visited September 12, 2012).
[13]     A heel spur is a "bony thickening of the proximal plantar surface of the calcaneus associated with severe pain on standing." STEDMAN'S MEDICAL DICTIONARY (6th ed. 2006).

March 2007 medical source opinion to the Bureau of Disability, Dr. Peske wrote that Plaintiff experienced "occasional swelling" of her left ankle with pain strictly related to the joint and no other area in her leg. (R. at 363-64). Further, he stated that she had no problems getting up from a chair, the exam table, lying down, sitting up, or performing a range of motion examination, was able to ambulate without difficulty, and walked in an upright position. (*Id*.). On October 15, 2007, Plaintiff had an x-ray of her knee taken at Mercy Jeannette Hospital which did not show acute fracture, dislocation, or joint deformities, though there was evidence of minimal soft tissue swelling. (R. at 448). An x-ray of her ankle taken at Westmoreland Regional Hospital on December 3, 2007 showed no fracture, dislocation, or bony destructive change, but a plantar calcaneal spur was noted. (R. at 444).

On April 23, 2008, Plaintiff appeared at the Mercy Jeannette Hospital emergency room for pain in her lower back. (R. at 403). X-rays were taken and all results were normal. (R. at 409, 440, 441). Plaintiff's attending physician that day was Dr. Liza Chopra, who diagnosed Plaintiff with left hip strain. (R. at 404, 410). Dr. Chopra prescribed Plaintiff eight pills of Tylenol #3 (Tylenol plus codeine)[14] with instructions for Plaintiff to take one or two every six hours as needed for pain. (R. at 404, 411). Plaintiff was instructed to follow up with Dr. Peske. (R. at 412). Plaintiff visited Dr. Peske on December 22, 2008 after "throwing out" her knee a week earlier and requested a refill of Naproxyn.[15] (R. at 427). A month later, she returned to see Dr. Peske on January 23, 2009 after a trip to the emergency room when her knee "gave out." (R. at 426). However, an examination did not reveal abnormalities beyond some tenderness over both

---

[14]      "Tylenol #3" is a combination of acetaminophen and codeine, used to treat mild to moderate pain. PubMed,       Acetaminophen       and       Codeine,       *available       at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601005.html (last visited September 12, 2012).
[15]      Naproxen is an NSAID, used to treat pain, tenderness, and swelling by stopping production of a substance that   causes   pain,   fever,   and   inflammation.   PubMed,   Naproxen,   *available   at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526/ (last visited September 12, 2012).

medial compartments. (*Id.*). The Court notes that at this visit, Plaintiff requested that Dr. Peske fill out a disability form on her behalf, but he declined because there was "no cause for disability." (*Id.*).

Plaintiff was evaluated for left knee pain by Dr. Gregory F. Habib, D.O. on January 12, 2010 after a referral by Dr. Kevin Wong, M.D., a primary care physician. (R. at 586). Plaintiff reported progressive pain and discomfort over the past six years, making it difficult for her to sit for any extended period of time. (*Id.*). She also reported stiffness upon standing. (*Id.*). After an x-ray, Dr. Habib diagnosed her with incidental right knee mild patellofemoral arthritis and mild varus deformity of the left knee and referred her for an MRI. (R. at 586-88). An MRI on January 18, 2010 revealed left knee patellar chondromalacia with infrapatellar synovitis. (R. at 585). Dr. Habib prescribed Plaintiff physical therapy, anti-inflammation medications, and a stabilizing brace, instructing her to follow up in six-week intervals. (*Id.*). On March 11, 2010, Plaintiff followed up with Dr. Habib and reported that physical therapy was helping her knee, that she had "less pain and discomfort," and felt "that she can live with the knee." (R. at 584). Dr. Habib noted that Plaintiff was wearing her knee brace and did not have any pain or discomfort and did have good range of motion. (*Id.*). He wrote she "has done well" and "told me that she could live with this at this point." (*Id.*).

### 2. Obesity, Hypothydroidism, Asthma, and Sleep Apnea

In his 2007 medical source opinion, Dr. Peske noted Plaintiff's obesity but that she "has no difficulty walking, sitting, [or] standing," and that it "does not give her any problem with shortness of breath or fatigue." (R. at 364). Here, he also acknowledged that Plaintiff had a history of asthma, but that she had not had an attack in approximately seven years. (R. at 360). Dr. Peske stated that upon examination, Plaintiff's chest and lungs were clear and she had no

chest pain. (R. at 360, 363). He reported Plaintiff claimed to suffer shortness of breath going up hills or after about twenty steps; however, she reported no changes with seasonal allergies, temperature changes, and did not experience wheezing. (*Id.*). In his 2009 medical source opinion to the Bureau of Disability, again Dr. Peske reported that Plaintiff's asthma was well controlled, and that "she has actually required no medication for this problem." (R. at 545). Similarly, Plaintiff's thyroid condition has been consistently documented as well controlled; for example, on October 28, 2008 and again on December 22, 2008, Dr. Peske saw Plaintiff and noted that her hypothydroidism was stable. (R. at 427-28).

As for her sleep apnea, Plaintiff's relevant medical history begins on April 23, 2008, when she was evaluated at Westmoreland Sleep Medicine for "possible sleep apnea" by a pulmonologist, Dr. Bharat Jain, M.D. (R. at 431, 488). Plaintiff complained of difficulty initiating and maintaining sleep, often being awakened for "no apparent reason" or gasping for air and choking. (*Id.*). She described taking "anywhere from a few minutes to a few hours" to fall asleep, getting an estimated total of six and a half hours of sleep each night. (*Id.*). She denied quitting breathing, sleep walking, or teeth grinding, but did experience night sweats, early morning headaches, tiredness, memory lapses, difficulty concentrating, body aches, and joint pains during the day and asserted that she did not feel refreshed upon awakening. (*Id.*). Plaintiff subsequently underwent formal overnight polysomnography testing on June 3, 2008, which revealed mild obstructive sleep apnea syndrome.[16] (R. at 489, 500). When CPAP Titration[17] was

---

[16]     Polysomnography testing measures "multiple physiologic variables associated with sleep," including "oxygen saturation, electrocardiography, air flow, respiratory effort, limb movement, eye and jaw muscle movement, and brain electrical activity." STEDMAN'S MEDICAL DICTIONARY (6th ed.).

[17]     CPAP is a technique where airway pressure is maintained above atmospheric pressure by pressurization of the ventilatory circuit. STEDMAN'S MEDICAL DICTIONARY (6th ed. 2006).

added, Plaintiff reported that the sleep was better than usual and that she felt awake but not alert. (R. at 501). Thereafter, Dr. Jain prescribed a CPAP machine to Plaintiff. (R. at 493, 501).

On August 14, 2008, Plaintiff followed up with Dr. Jain after using the CPAP machine for a few weeks and stated that she had noticed improvements in her sleep. (R. at 493). Dr. Jain concluded the appointment with instructions to continue using the same CPAP setup and follow up again in six months. (*Id*.). When Plaintiff returned to see Dr. Jain on February 12, 2009, she reported using the CPAP machine as prescribed, but that it had recently begun to cause her a cough and dry mouth. (R. at 495). Nevertheless, Dr. Jain decided against adjusting her current CPAP settings pending a repeat sleep study, noting Plaintiff had gained over twenty pounds since her last appointment six months ago. (*Id*.). When a second nocturnal polysomnography with CPAP Titration was performed later that month, Plaintiff reported sleeping worse than usual and that she felt awake but not alert. (R. at 502). However, Dr. Jain continued Plaintiff's CPAP treatment. (R. at 503).

Following Plaintiff's follow-up appointment with Dr. Jain on April 13, 2009, he wrote she "was exposed to significant hay and was experiencing significant rhinitis and difficulty breathing with cough." (R. at 497). Dr. Jain adjusted the settings on her CPAP machine and prescribed her Singulair to treat her rhinitis and asthma. (*Id*.). On January 25, 2010, Plaintiff saw Dr. Vilharika K. Bakshi, M.D. and stated she felt well other than "minor complaints," showing improvement in activity level and getting approximately four to eight hours of sleep daily. (R. at 604). On March 1, 2010, Dr. Wong noted that Plaintiff reported getting more than eight hours of sleep daily. (R. at 601).

### 3. Migraine Headaches

Plaintiff reports suffering from recurrent, severe headaches since high school. (R. at 519). Dr. Hunter ordered an MRI of Plaintiff's brain, which was performed on March 6, 2006 at Mercy Jeannette Hospital. (R. at 314, 459). Although the MRI revealed no abnormalities, it did show "minimal chronic sinusitis changes." (*Id*.). Months later, Plaintiff saw Dr. Peske in September 2006 complaining of rib pain, a cold, and tension headaches. (R. at 359). In his 2007 medical source opinion, Dr. Peske wrote that Plaintiff described a few frontal side and back headaches which seemed to be triggered by different odors. (R. at 362). He added that Plaintiff had no history of dizziness, fainting, blackouts, seizures, convulsions, eye trouble, hearing trouble, dental or mouth problems, nosebleeds, allergies, hay fever, or hoarseness. (*Id*.). In September 2008, Plaintiff saw Dr. Peske for a headache in her right temporal area and around her eyes that she claimed had lasted a week, to which she could find no relief from Naproxyn, Advil, or Excedrin Migraine. (R. at 430). Upon examination, Dr. Peske diagnosed her with allergic rhinitis and prescribed her Nasonex nasal spray[18] and Loratadine.[19] (*Id*.).

Plaintiff was admitted to the emergency room at Westmoreland Hospital on May 18, 2009 after complaining of facial numbness on her right side accompanied by a headache, weakness in her right arm and leg, and an off-balance gait. (R. at 506-512). Her attending physician, Dr. Scott Jacobson, D.O., referred Plaintiff to Dr. Louis Catalano, M.D. for a comprehensive neurological consultation. (R. at 518-19). Dr. Catalano diagnosed Plaintiff with complex migraine headaches with right facial paresthesia[20] and mild right hemiplegia,[21] for

---

[18]     Nasonex is the brand name for mometasone nasal inhalation. It "is used for the treatment and prevention of nasal symptoms of seasonal and year-round allergies, including runny nose, sneezing, and itchy nose... [i]t works by reducing inflammation  (swelling) in the nasal passages." PubMed Health, Mometasone Nasal Inhalation, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000204 / (last visited September 12, 2012).

[19]     Loratadine is an antihistamine and is used to temporarily relieve the symptoms of hay fever and other allergies. PubMed Health, Loratadine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001010/ (last visited September 12, 2012).

[20]     Paresthesia is "spontaneous abnormal usually nonpainful sensation (e.g. burning, pricking)" STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

which he prescribed Topamax.[22] (R. at 519-20). Plaintiff followed up with Dr. Catalano on June 8, 2009 at the Neurological Institute of Western Pennsylvania. (R. at 549). She reported daily headaches and experiencing side effects from Topamax and no relief from over the counter medication. (*Id.*). Dr. Catalano referred Plaintiff for an EEG, which was performed on June 22, 2009 with a normal outcome. (R. at 551). An MRI on July 6, 2009 did not reveal any abnormalities, either. (R. at 552). In his July 13, 2009 letter to Dr. Peske, Dr. Catalano wrote that Plaintiff reported daily headaches but did experience relief from Fioricet,[23] and he continued treatment with her current medications. (R. at 550).

### 4. Hiatal Hernia

On December 14, 2006, Plaintiff presented to the emergency room at Mercy Jeannette Hospital reporting upper abdominal pain and was treated overnight. (R. at 316-18, 333-34). She was consulted by Dr. Balu Shetty, a gastroenterologist, at which time Plaintiff reported nausea but no vomiting, denied headaches and cough, and appeared "alert, well oriented and in no distress." (R. at 317). Following a gastroscopy, Dr. Shetty diagnosed Plaintiff with a hiatal hernia and severe gastritis before prescribing her Protonix to be taken daily for four weeks. (R. at 317-18, 333-34).

A chest x-ray taken on August 3, 2007 at Mercy Jeannette Hospital revealed that Plaintiff had clear lung fields and pleura signifying an overall normal chest. (R. at 452). On September 17, 2007, Plaintiff was examined at Latrobe Hospital for abdominal pain; a sonogram was taken and was normal. (R. at 450). Months later, on January 2, 2008, Plaintiff was admitted to the

---

[21]        Hemiplagia is "paralysis on one side of the body." STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[22]        Topamax is the brand name for Topiramate, which is used to treat seizures and prevent migraine headaches. It is   in a class of medications called anticonvulsants. PubMed Health, Topiramate, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000998/ (last visited September 12, 2012).

[23]        Fioricet is a combination of acetaminophen, butalbital, and caffeine. It is used to relieve tension headaches, but may be prescribed for other uses. PubMed Health, Acetaminophen, Butalbital, and Caffeine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000016/ (last visited September 12, 2012).

emergency room at Mercy Jeannette Hospital for chest pain (R. at 392-402). Another chest x-ray was taken and compared to that from August 3, 2007, again revealing clear lungs. (R. at 398, 443). Plaintiff was attended by Dr. Yechiel A. Reit, M.D., who diagnosed her with nonspecific chest pain, suggesting it could be related to her hiatal hernia. (R. at 399). She was discharged with instructions to follow up with Dr. Peske. (*Id.*)

At a September 29, 2008 visit with Dr. Peske, Plaintiff reported sharp pain in the right side of her stomach, nausea, and constant pain in the right side of her chest, but no cough, stuffy head or nose. (R. at 429). On March 10, 2009, Plaintiff was admitted to the emergency room at Westmoreland Hospital, complaining of chest pain and a cough beginning two days earlier. (R. at 466-71). Dr. Neil Baum, M.D. treated Plaintiff, diagnosing her with musculoskeletal chest pain after a chest x-ray was taken and was normal. (R. at 471, 484).

### 5. Mental Impairments

Plaintiff has a history of depression that includes a hospitalization in 1996. (R. at 361). However, in his 2007 medical source opinion, Dr. Peske noted Plaintiff "refers to her previous depression, but denies any present problems with depression." (R. at 362). Again, on April 23, 2008, Plaintiff told Dr. Jain that her depression was "adequately controlled." (R. at 435, 489). At her May 19, 2009 neurological consultation with Dr. Catalano, he noted "no signs or symptoms" of anxiety or depression. (R. at 508). While Plaintiff reported worsening depression and panic attacks at a January 25, 2010 appointment with Dr. Bakshi, she claimed that she can take long walks and sometimes spends all day on her computer keeping in touch with people on Facebook. (R. at 604). Dr. Bakshi noted she did not show signs of bipolar depression, but did prescribe her an anti-depressant and referred her to psychiatry for evaluation. (R. at 605).

As for Plaintiff's alleged learning disability, in his 2007 medical source statement, Dr. Peske wrote that Plaintiff's chief complaint was "illiteracy," noting, "she is a slow learner, spells poorly, does not read well, and cannot hold a job secondarily with regard to specific information requested in this report." (R. at 360). However, Dr. Peske reported that Plaintiff's mental status was normal with respect to her judgment, intelligence, affect, orientation, and memory. (R. at 364).

On July 21, 2009, Dr. Timothy Bridges, Ph.D. conducted a Clinical Psychology Disability Evaluation of Plaintiff on behalf of the Bureau of Disability. (R. at 553). He indicated that Plaintiff initially denied receiving psychiatric treatment, but later admitted to a hospitalization as a teenager at Monsour Medical Center. (R. at 553-54). Plaintiff stated that she was hospitalized for "a couple of months" due to depression, regarding which her mother "wanted a second opinion." (R. at 554). Dr. Bridges reported that Plaintiff exhibited poor dress, grooming, and hygiene and her facial expression remained flat, though she was able to convey appropriate eye contact. (R. at 555). He described the rate, volume, and structure of her speech as limited but adequate. (*Id*.). Plaintiff was not conversational and mostly spoke only when addressed. (*Id*.). She reported a low concentration level and to spending most of her time at home, watching television. (*Id*.). Dr. Bridges described Plaintiff's concentration level that day as "fair" and her mood as "depressed." (*Id*.). She discussed trouble sleeping and other physical ailments, and claimed to suffer from a poor appetite, stating: "Sometimes I don't even eat at all"; however, Dr. Bridges noted that Plaintiff was an estimated thirty to fifty pounds overweight. (*Id*.). Plaintiff denied getting along well with others and claimed to "keep to herself." (*Id*.). Dr. Bridges expressed suspicions that Plaintiff was "functioning well below the average intellect," possibly within the mental retardation range. (*Id*.) He believed that Plaintiff's ability to

understand, remember, and carry out detailed instructions was markedly limited, and she was moderately limited in her ability to engage in work-related interactions. (R. at 557).

Overall, Dr. Bridges opined that Plaintiff's memory and thought content appeared to be fair and consistent with her IQ and that her judgment and insight appeared adequate, though she appeared to suffer from relatively low self-esteem. (R. at 555). He found Plaintiff to be attentive and alert, and her answers appeared accurate and reliable. (R. at 555-56). He concluded that Plaintiff was capable of handling daily affairs, though his impression was that her psychosocial stressors were of a moderate level. (R. at 556). Dr. Bridges assigned Plaintiff a current GAF[24] of 50 and estimated the same for her highest in the past year. (*Id.*).

**C. Functional Capacity**

Dr. Dilip S. Kar, M.D. performed a physical residual functional capacity assessment of Plaintiff on April 3, 2007, concluding that the medical evidence supported a diagnosis of arthritis in Plaintiff's ankle. (R. at 365, 370). On August 3, 2009, Dr. Nghia Van Tran, M.D., Ph.D. gave Plaintiff a second physical residual functional capacity assessment, finding that the medical evidence established medically determinable impairments of asthma, lower back pain,

---

[24]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed.2000). An individual with a GAF score of 91–100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81–90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71–80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61–70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51–60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41–50 may have "[s]erious symptoms (e.g., suicidal ideation ... )" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31–40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21–30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas;" of 11–20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1–10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death."

14

hypothydroidism and sleep disorder. (R. at 581). Each physician found the evidence established some exertional limitations on how much weight Plaintiff could lift at once and on how long she could sit and stand: Dr. Kar and Dr. Van Tran both determined Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds and could sit for a total of six hours of an eight-hour workday; while Dr. Kar found that Plaintiff could only stand for two hours out of an eight-hour day, Dr. Van Tran concluded that she could stand for six. (R. at 366 and 577). Additionally, both Dr. Kar and Dr. Van Tran felt that Plaintiff's environmental limitations were affected with respect to her exposure to extreme cold, extreme heat, wetness, humidity, and fumes; while Dr. Van Tran felt she must avoid even moderate exposure, Dr. Kar concluded that Plaintiff was limited to avoiding concentrated exposure. (R. at 368 and 377). Further, both doctors concluded that Plaintiff was otherwise unlimited to pushing and pulling operations, exposure to noise, vibration, and environmental hazards, and had no postural, manipulative, visual, or communicative limitations. (R. at 366-68 and 77-79).

Dr. Kar found Plaintiff's statements to be partially credible based on the evidence of record. (R. at 370). In his opinion, Plaintiff's daily activities did not support a finding that she was significantly limited in relation to her alleged symptoms, as she reported that she could drive, walk two miles, do chores, was not attending physical therapy, did not require an assistive device to ambulate, and had not been prescribed narcotic medication for pain. (*Id*.). Controlling weight was given to Dr. Peske's medical source opinion from March 2007, in which he reported that despite some limitations in standing and walking, Plaintiff was not disabled. (R. at 371). Dr. Van Tran also found Plaintiff's statements to be partially credible regarding her description of daily activities that are significantly limited. (R. at 582). Dr. Van Tran noted that Plaintiff had

reported improvements in her sleep apnea with the CPAP machine on her August 14, 2008 follow-up with Dr. Jain. (*Id.*)

In a mental residual functional capacity assessment by Dr. Richard A. Heil, Ph.D. on April 9, 2007, he concluded that the medical evidence supported medically determinable impairments of a specific learning disorder and history of depression, but that Plaintiff could meet the basic mental demands of competitive work on a sustained basis. (R. at 374). He summarily concluded that Plaintiff had no marked limitations with respect to the mental categories evaluated. (R. at 372-73). Specifically, he found that Plaintiff remained capable of understanding and remembering instructions, concentrating, interacting with others, and adapting to changes in the workplace, with no restrictions on adaptation. (R. at 374). He found Plaintiff's statements to be partially credible based on the evidence of record, and gave consideration to Dr. Peske's 2007 medical source opinion stating that Plaintiff was not disabled. (*Id.*). Based on his diagnoses, Dr. Heil rated functional limitations for Listings 12.02 and 12.04, finding that Plaintiff was moderately limited in her ability to maintain concentration, persistence, or pace, but was otherwise mildly limited with respect to activities of daily living and social functioning and had no limitations with respect to decompensation. (R. at 386).

Dr. Arlene Rattan, Ph.D. performed a second mental residual functional capacity assessment of Plaintiff on July 28, 2009, in which she found that the medical evidence supported a medically determinable impairment of major depressive disorder. (R. at 561). While Dr. Rattan's summary conclusions included marked limitations specifically regarding Plaintiff's ability understand, remember, and carry out detailed instructions, she opined that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis. (R. at 559-61). Dr. Rattan determined that despite Plaintiff's limitations, she could still be expected to

understand and remember simple instructions, perform simple tasks, make simple decisions, ask simple questions and accept instruction, and sustain an ordinary routine without special supervision. (R. at 561). She found Plaintiff's statements to be partially credible, and relied on the opinions of Dr. Bridges and Dr. Peske in his 2009 medical source opinion, noting he described Plaintiff as "an emergency room abuser." (R. at 561, 574). Therefore, Dr. Rattan determined that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis. (*Id.*). Based on her diagnosis, Dr. Rattan rated functional limitations for Listing 12.04, finding moderate limitations with respect to social functioning and concentration, persistence, or pace, but that Plaintiff's activities of daily living were only mildly limited and that she had no limitations with regard to decompensation. (R. at 572).

### D. Administrative Hearing

A hearing regarding Plaintiff's application for SSI was held on November 17, 2010 in Latrobe, Pennsylvania before ALJ Raymond J. Zadzilko. (R. at 41). Plaintiff appeared with the assistance of her non-attorney representative, Daniel Rucker. (*Id.*). Irene Montgomery, an impartial vocational expert, also testified.[25] (*Id.*). Plaintiff testified that she was not engaged in employment and that her income was derived from welfare food stamps. (R. at 51). Her fiancé, who typically worked as a forklift operator, was also unemployed at the time of the hearing. (*Id.*). When the ALJ asked about the short duration of jobs she has previously held, Plaintiff explained that she left due to health problems or, in some instances, an inability to satisfactorily perform the job. (R. at 52-53). She provided an example of losing a temporary job on a progression line because she could not keep up with the rate of orders she was required to send

---

[25] Irene Montgomery is a professional counselor and an American Board of Vocational Experts Fellow with many years of experience working as a vocational expert. (R. at 153-55).

out.  (*Id.*).  As a grocery store cashier, Plaintiff was fired for repeatedly failing to balance her cash drawer.  (R. at 53).

Plaintiff answered specific questions pertaining to her physical condition.  (R. at 53).  She stated that she has a driver's license and can drive unless she has a headache. (R. at 47-48). At the time of the hearing, Plaintiff was five feet, four inches (5"4) tall, weighing 269 pounds.  (R. at 48, 50). She reported suffering from injuries to her left ankle and knee, back pain, asthma, anemia, hiatal hernia, sleep apnea, hypohydroidism, and depression. (R. at 54-55). Plaintiff's ankle and knee injury occurred when her knee gave out from under her as she was standing, causing her to twist her ankle at the same time. (R. at 58).  Plaintiff testified to never receiving surgery and only occasionally wearing a knee brace.  (*Id.*).  Additionally, she noted that her back pain was only related to her job as a dishwasher.  (R. at 52, 58-59). She reported being able to stand for a sustained period of 2 to 3 hours before experiencing pain, and believed she could lift 50 pounds at once one time per day without pain. (R. at 59).

As to her asthma, Plaintiff said she had not visited a doctor for that purpose since her diagnosis and only used medication to treat it during physical activity as needed.  (R. at 57). With respect to her migraine headaches, Plaintiff testified that she visited a neurologist for treatment approximately once a year, but experienced them daily, some lasting all day. (R. at 54-55, 60-61).  Although unaware of a specific cause, she believed physical activity and noise made them worse. (R. at 61). She admitted to using the CPAP machine to treat her sleep apnea, but claimed she remained tired, sleeping through an entire day some days each week and awakening only to eat and use the bathroom. (R. at 62-63). As to her hypothyroidism, Plaintiff reported taking pills once per day though her condition did not change without the medication.  (R. at 56). Plaintiff described suffering depression for five years, which caused her to not want to be

18

"bothered by people." (R. at 63). According to Plaintiff, she often had little energy and felt worthless or guilty for no reason.  (R. at 68). However, Plaintiff denied having thoughts of suicide or of harming others.  (R. at 69). Plaintiff also complained of a loss of appetite, claiming to eat only one meal per day because she feels "no urge of eating."  (R. at 67-68).

Plaintiff denied dining out with her fiancé and reported they usually order takeout and eat at home.  (R. at 73). As to her home life, Plaintiff testified that her fiancé takes care of most of the chores, except for one meal a day, which Plaintiff prepares.  (R. at 64-65).  When asked why she does not engage in household activities, Plaintiff answered she does not "feel the urge" to do chores; however, Plaintiff does occasionally pick up pieces of trash in her yard.  (R. at 65). Plaintiff claimed to previously enjoy riding bicycles, but that she was no longer able to do so as a result of her conditions.  (R. at 66). She testified to attending train shows two times per month with her fiancé and that she belonged to the Allegheny Northern Railroad Club as its secretary, though she claimed to have no actual role in the club and had not recently attended meetings. (R. at 64). Plaintiff's daily activities primarily consisted of painting model train houses and playing simple computer games, and she occasionally spoke to family and friends on the phone for approximately fifteen minutes at a time.  (R. at  66-67).

Plaintiff provided testimony regarding her educational history, stating that she graduated from high school where she took special education and food service courses.  (R. at 48-49). Plaintiff claimed to have trouble understanding newspapers, except for captions and headlines, and testified that her fiancé takes care of her finances because she has trouble using a checkbook and paying bills.  (R. at 49-50). She described difficulty with counting and reading, illustrating that she used her fingers to calculate and that at one point she was unable to understand words in a "kindergarten book" she was reading to her niece. (R. at 72-73). Plaintiff also described

difficulty concentrating on television programs, claiming to only maintain interest in 2 out of 10 programs.  (R. at 68-69).  Further, she claimed that it takes her a week to paint a model train house that her fiancé could complete in only two hours, as she is unable to concentrate on the project.  (R. at 70).

At the conclusion of Plaintiff's testimony, the ALJ examined Ms. Montgomery by posing hypothetical questions without regard to past work experience, since he found that Plaintiff had none. (R. at 75-76). For his first hypothetical question, the ALJ began by asking Ms. Montgomery to consider a person with Plaintiff's age, education, training and work experience, assuming a light maximum RFC that includes sedentary work; this person "must avoid concentrated exposure to extreme heat, extreme cold, humidity, wetness, dust, fumes, odors, gases, and poor ventilation," and the work "should be simple, routine, low stress in nature, with no deadlines or fast-paced production"; there should be no interaction with the public, no more than occasional interaction with co-workers or supervisors, no teamwork jobs, and reading should not be required. (*Id*.). Based on these limitations, he asked Ms. Montgomery if she could suggest any light and sedentary jobs. (R. at 76).

Ms. Montgomery responded that, based upon the hypothetical, she could suggest the following light, full-time positions: (1) a ticketer in a retail or warehouse setting, estimating a national availability of over 575,000 jobs; (2) an inspector of products, such as plastics or metal, with approximately 90,000 available; and (3) a small parts assembler, with over 105,000 available openings. (R. at 76). For his second hypothetical, the ALJ asked Ms. Montgomery if, based on the same set of limitations, there would be any jobs at the sedentary level of work. (R. at 77). She suggested: (1) a table worker, estimating that there were almost 90,000 of these jobs available nationally; (2) an addresser/mail sorter, which she clarified did not involve reading

comprehension, only recognition, estimating there were about 47,000 openings; and (3) an electrical electronic assembler, such as one of semiconductors, estimating over 200,000 jobs were available nationally. (*Id.*). Finally, the ALJ inquired as to employers' guidelines for being on task, given Plaintiff's testimony regarding focus and concentration. (R. at 77-78). Ms. Montgomery replied that employment would be compromised if an individual were regularly and consistently off task ten percent of the time. (R. at 78). As to absences, workers generally cannot miss more than ten to fifteen days of work each year. (*Id.*). She added that, once trained, workers in these positions would only require supervision, at most, occasionally. (*Id.*).

## IV.    STANDARD OF REVIEW

To be eligible for disability benefits under the Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment, which has lasted or can be expected to last for a continuous period of at least twelve months, or which can be expected to result in death. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). To determine whether a claimant has met the requirements for disability, the Commissioner must utilize a five-step sequential analysis in reviewing the claim. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x. 1; (4) whether the claimant's impairments prevent her from performing past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. §

404.1520(a) (4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume past relevant work, the burden shifts to the Commissioner at Step Five to prove that, given the claimant's mental or physical limitations, age, education, and work experience, she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[26], 1383(c)(3)[27]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

When considering a case, a district court cannot conduct a *de novo* review, nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995

---

[26]    Section 405(g) provides in pertinent part: "Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action… brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business." 42 U.S.C. § 405(g).

[27]    Section 1383(c)(3) provides in pertinent part: "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion… so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986).

## V.     DISCUSSION

The ALJ issued his decision on December 8, 2010, concluding that Plaintiff retained the residual functional capacity to perform light to sedentary work and that there were a significant number of representative jobs available in the national economy which she could perform. (R. at 24-36). The ALJ first acknowledged that Plaintiff satisfied Step One of the analysis because she had not been engaged in substantial gainful activity since her application date of March 9, 2009 (20 C.F.R. § 416.971 *et seq*.). (R. at 26). At Step Two, the ALJ found that Plaintiff's obesity, asthma, left knee patellar chondromalacia with infrapatellar synovitis, recurrent major depressive disorder, and a learning disability related to reading were medically determinable severe impairments, pursuant to 20 C.F.R. § 416.920(c). (R. at 26). However, he found that Plaintiff's stomach hernia, migraines, thyroid disorder, sleep apnea, low back pain, left ankle sprain from November 2006 were nonsevere impairments. (R. at 26-27). In making this determination, he found that there was no evidence these additional conditions had caused any significant complications or work-related limitations to Plaintiff, nor had they required frequent inpatient hospital confinement or emergency room care.   (*Id*.). As a result, the ALJ decided these

additional impairments, individually and in combination, did not have more than a minimal impact on Plaintiff's ability to work. (R. at 27).

At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments meeting or exceeding one of the listings in 20 C.F.R. Pt. 404, Subpt. P, App'x 1, 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. (R. at 27-28). In reaching his decision, the ALJ found that the medical evidence did not contain the objective signs, symptoms or findings, or the degree of functional limitations necessary for any of Plaintiff's physical or mental impairments, singly or in combination, to meet or equal the severity of a listing. (R. at 28). The ALJ noted that he considered Plaintiff's obesity in accordance with SSR 02-01 in making this determination, but concluded it did not have a significant impact on her other body systems or significantly affect her ability to ambulate. (*Id.*). He relied on opinions from the state agency medical consultants, as well as the medical records, finding that no treating or examining medical source has stated that Plaintiff has an impairment or combination of which that could meet or equal a listing. (*Id.*). Further, he added that the evidence shows Plaintiff lives independently and does not rely on anyone else for her personal care, there was no evidence that she demonstrated sub-average general intellectual functioning before age 22, and nor was there evidence of any valid IQ score of 70 or less. (R. at 30).

Moving to an evaluation of Plaintiff's residual functional capacity, the ALJ found that, considering the record in its entirety, she retained the ability to perform light work as defined in 20 C.F.R. § 416.967(b), subject to certain restrictions. (R. at 30). Here, he considered the objective medical evidence concerning each of Plaintiff's impairments. (R. at 31). Additionally, he considered Plaintiff's subjective complaints in accordance with SSR 96-7p and 20 C.F.R. § 416.929, and found that her medically determinable impairments could reasonably be expected

to cause the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment. (R. at 32). The ALJ noted Plaintiff's July 2009 GAF score of 50, indicative of serious symptoms or impairments in social, occupational, or school functioning. (R. at 34). However, pursuant to SSR 96-5 and 20 C.F.R. § 416.927, he concluded that the totality of the evidence did not support placing controlling weight on Dr. Bridges' opinion because it was inconsistent with the other evidence of record, particularly the opinions of Dr. Peske and the State Agency medical consultants. (R. at 34-35). Accordingly, as Plaintiff had no past relevant work, at Step Four the ALJ decided that Plaintiff retained the ability to perform work at the light exertional level. (R. at 30, 35). At Step Five, the vocational expert identified a number of light and sedentary jobs someone with Plaintiff's limitations could perform. (R. at 35-36). Thus, the ALJ found Plaintiff not disabled within the meaning of the Act. (*Id*.).

Plaintiff argues that summary judgment in her favor is proper because the ALJ's decision was not based upon substantial evidence. (Docket No. 9 at 4). Specifically, she claims that the ALJ erred at Step Three "by failing to do an analysis of Plaintiff's obesity in combination with her sleep apnea" under Listing 3.10, pertaining to Sleep-Related Breathing Disorders. (*Id*. at 3). Additionally, Plaintiff contends that "[t]he ALJ did not properly evaluate Plaintiff's obesity" in combination with her sleep apnea, "borderline intellectual functioning," depression, "moderate impairments in pace," and "severe migraine headaches" when making his residual functional capacity assessment. (*Id*. at 4). Further, she alleges that "[t]he vocational expert's opinions that the Plaintiff can do alternate sedentary and light duty work are not based upon substantial evidence." (*Id*. at 3). She claims that the ALJ erred in his hypothetical "by not including all of

the Plaintiff's impairments in his hypothetical question" and "concerning Plaintiff's moderate limitations with regard to concentration, persistence, or pace." (*Id*. at 3-4).

In response, Defendant asserts that substantial evidence supports the Commissioner's finding that Plaintiff could perform a range of unskilled, light work, and is therefore not disabled under the Act. (Docket No. 11). Because Plaintiff presents a flurry of disorganized contentions in the Arguments portion of her Brief, the Court will address the ascertainable issues as they sequentially fall in the five-step analysis.

### A. Listings Determination

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992) (emphasis in original) (quoting *Sullivan v. Zebley*, 493 U.S. 521 (1990)). In a case of obesity, an ALJ is required to "meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and every subsequent step." *Diaz v. Comm'r of Soc. Sec.*, 755 F.3d 500, 504 (3d Cir. 2009). In performing a listings analysis of a claimant's obesity, the ALJ must remember: "the combined effects of obesity with other impairments *can* be greater than the effects of each of the impairments considered separately." SSR 02-1p at 1 (emphasis added). However, while "[o]besity is a risk factor that increases an individual's chances of developing impairments in most body systems… [t]he fact that obesity is a risk factor for other impairments does not mean that individuals with obesity *necessarily* have any of these impairments." *Id*. at 3 (emphasis added).

Plaintiff argues that the ALJ erred at Step Three of the analysis by finding that she does not have an impairment or combination of impairments that meets or medically equals one of the

listings under 20 C.F.R. Pt. 404, Subpt. P, App'x 1. (Docket No. 9 at 6). Specifically, she contends that the ALJ failed to consider the effects of her obesity on her respiratory system under Listing 3.10, Sleep Related Breathing Disorders. (*Id*.). According to Plaintiff, "the ALJ neither specifically identified Listing 3.10 nor analyzed Plaintiff's sleep apnea in combination with obesity to determine whether it meets or is equivalent to that Listing." (*Id*. at 8). The Court agrees with Defendant that "[t]here is no merit to this contention." (Docket No. 11 at 10). First, as Defendant correctly points out, the ALJ specifically indicated that none of Plaintiff's impairments met or equaled the severity of *any subsection* of §§ 1.00, 3.00, or 12.00. (R. at 28, emphasis added; *see* Docket No. 11 at 10). Because Listing 3.10 is a subsection of Section 3.00, it was adequately identified by the ALJ when deciding that Plaintiff's impairments did not meet or equal any of the listings. Nevertheless, Plaintiff could not meet or exceed either of the conditions falling under Listing 3.10, which directs an evaluation under "3.09 (chronic cor pulmonale) or 12.02 (organic mental disorders)." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §3.10. To meet Listing 3.09 *Cor pulmonale secondary to chronic pulmonary vascular hypertension*, "clinical evidence of cor pulmonale" must be accompanied by: A.) *Mean pulmonary artery pressure greater than 40 mm Hg*; or, B.) *Arterial hypoxemia. Id*. at §3.09 (emphasis added). As for Listing 12.02, "History and physical examination or laboratory tests demonstrate the presence of a specific organic factor to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." *Id*. at §12.02.

Plaintiff points to the Introduction to Section 3.00 at Subparagraph H, concerning sleep apnea, arguing, "[w]hen gainful work is precluded, the physiologic basis for the impairment may be chronic cor pulmonale" and "[i]mpairment of cognitive function may be evaluated under organic mental disorders." (Docket No. 9 at 6-7 (quoting 20 C.F.R. Pt. 404, Subpt. P, App'x 1,

§3.00H)). Indeed, sleep apnea *may* cause chronic cor pulmonale or an organic disorder. *See Id*. However, there is no medical evidence that Plaintiff *has* chronic cor pulmonale or an organic mental disorder. As the ALJ noted at Step Two: "Although [Plaintiff] was diagnosed with a sleep disorder in June 2008, in August 2008 Dr. Bharat Jain, a treating pulmonologist, reported that [Plaintiff] was using a CPAP machine and her condition was improved." (R. at 27). When a second nocturnal polysomnography with CPAP Titration was performed later that month, Plaintiff reported sleeping worse than usual and that she felt awake but not alert. (R. at 502). Plaintiff was again prescribed CPAP treatment. (R. at 503). Following Plaintiff's follow-up appointment with Dr. Jain on April 13, 2009, he wrote that she "was exposed to significant hay and was experiencing significant rhinitis and difficulty breathing with cough." (R. at 497). It is noted that Dr. Jain continued Plaintiff's treatment with CPAP and prescribed her Singulair to treat her allergies. (R. at 497). Additionally, in 2010, Plaintiff reported on two occasions that she was sleeping approximately eight hours a night. (R. at 601, 604). Thus, substantial evidence supports the ALJ's finding that Plaintiff's sleep apnea was a nonsevere medically determinable impairment, neither alone nor in combination with another, medically equivalent to a listing.

Additionally, the Court finds that the medical evidence substantially supports the ALJ's determination that, although Plaintiff's obesity was a severe impairment, it did not have a significant impact on her other body systems or significantly affect her ability with ambulation, mobility or manipulation. Under the Regulations, the ALJ "will not make assumptions about the severity or functional effects of obesity combined with other impairments," but "will evaluate each case based on the information in the case record." SSR 02-1p at 5. The ALJ plainly states he "considered the claimant's obesity in accordance with SSR 02-1 and… determined it does not have a significant impact on her other body systems or significantly affect her ability with

ambulation, mobility or manipulation." (R. at 28). Accordingly, the ALJ's decision that Plaintiff's obesity did not satisfy all criteria required to meet or exceed a listing, including Listing 3.00, is supported by substantial evidence.

Because Plaintiff's impairments do not satisfy the requisite criteria to match any listing, *Williams* directs the Court to agree with Defendant that "[n]either of these sections [under Listing 3.10] of the listings are applicable to Plaintiff because she has neither condition." (Docket No. 11 at 10); *see Williams*, 970 F.2d at 1186. Thus the ALJ's finding that Plaintiff's obesity alone or in combination with her sleep apnea was insufficient to meet or equal a listing is supported by substantial evidence. SSR 02-1p at 5.

### B. RFC Determination

Additionally, Plaintiff contends, "The ALJ did not properly evaluate Plaintiff's obesity" in combination with her sleep apnea, "borderline intellectual functioning," depression, "moderate impairments in pace," and "severe migraine headaches" when making his residual functional capacity assessment. (Docket No. 9 at 4). "Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359, *fn. 1* (3d Cir. 1999)); *see also* 20 C.F.R. §404.1545(a). "An ALJ must consider all relevant evidence when determining an individual's RFC. 20 C.F.R. § 404.1545(a); *Burnett,* 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). An individual claimant's residual functional capacity is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(c)(2). The ALJ's

finding of residual functional capacity must be "accompanied by a clear and satisfactory explication of the basis on which it is based." *Fargnoli*, 247 F.3d at 41 (quoting *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981)).

Here, the ALJ found that Plaintiff has the RFC to perform light work as defined in 20 C.F.R §416.967(b) except she:

> must avoid concentrated exposure to extreme heat, extreme cold, humidity, wetness, dust, fumes, odors, gases, and poor ventilation. In addition, [she] is limited to simple, routine, low stress tasks  with no deadlines or fast-paced production. Moreover, [she] must avoid teamwork-type jobs and is limited to no interaction with the public and only occasional interaction with coworkers and supervisors. Finally, [she] is limited to jobs that do not require reading comprehension. (R. at 30).

The ALJ asserts that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as "opinion evidence" in accordance with 20 C.F.R. §416.927 and Social Security Regulations. (R. at 30). In analyzing Plaintiff's residual functional capacity, the ALJ noted that the state agency psychologists[28] concluded she "retained the ability to meet the basic mental demands of competitive work on a sustained basis notwithstanding her condition." (R. at 34). Additionally, he considered the opinions of the state agency medical consultants, who determined that Plaintiff was capable of performing work at the sedentary to light duty level. (R. at 35).

"RFC does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p at 2. To qualify for "light work" under the Act, the critical test is not whether Plaintiff can lift a maximum of 20 pounds once in awhile; the test is whether

---

[28]     "State agency physicians and psychologists are considered to be 'highly qualified physicians and psychologists who are also experts in Social Security disability evaluation,' and the ALJ must consider their findings as opinion evidence." *Poulous v. Comm'r of Soc. Sec. Admin.*, 474 F.3d 88, 93, *fn. 2* (3d Cir. 2007) (quoting 20 C.F.R. §§ 404.1527(f) and 416.927(f)).

Plaintiff can frequently lift up to 10 pounds. 20 C.F.R. § 404.1567(b). The ALJ points to Plaintiff's March 2006 Function Report, in which she reported her ability to lift and carry 20 pounds and walk 2 miles, as well as Dr. Wong's treatment records, noting that Plaintiff reported taking long walks. (R. at 32). The ALJ also relied on Plaintiff's testimony, in which she reported being able to stand for 2 to 3 hours at a time, sit 2 hours at a time, and lift something weighing 50 pounds, in addition to her testimony regarding her daily activities. (*Id.*).

In support of her argument that the ALJ erred in his residual functional capacity assessment by "fail[ing] to consider Plaintiff's nonexertional limitations caused by her obesity in combination with her sleep apnea," Plaintiff cites to *Poulous v. Comm'r of Soc. Sec. Admin.*, 474 F.3d 88 (3d Cir. 2007). (Docket No. 9 at 9). It is unclear on which basis Plaintiff grounds her contention that the ALJ's decision is "contrary to *Poulous*," but she goes on to say that her "severe obesity condition should have been submitted to the vocational expert for her consideration about Plaintiff's ability to do less than the full range of sedentary and light work." (*Id.*). Therefore, the Court can best ascertain Plaintiff's allegation regarding the residual functional capacity assessment of her obesity as one intended to support her argument regarding the insufficiency of the hypothetical question.[29] Still, we will pause to address this claim here, since it overlaps at both steps of the analysis, and to distinguish *Poulous*.

*Poulous* was remanded, in part, based on the Court's finding that reliance on the Medical-Vocational Guidelines ("grids") in the presence of the claimant's nonexertional limitations "constitutes reversible error…" *Poulous*, 474 F.3d at 93-94. However, Plaintiff's reliance on

---

[29]   "[O]bjections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself. That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony… that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey these limitations to the vocational expert. Challenges of [this] variety… are best understood as challenges to the RFC assessment itself." *Rutherford v. Barnhart*, 399 F.3d 546, 554, *fn. 8* (3d Cir. 2005).

*Poulous* is misplaced; there, the ALJ "summarily concluded" that the obese claimant, who needed special chairs to support his weight, would not be disabled from performing sedentary work, "based solely on [the ALJ's] own opinion," and with "no evidence supporting the ALJ's conclusion." *Poulous* at 94-95. In contrast, here, the ALJ's determination regarding Plaintiff's nonexertional limitations is supported by substantial evidence, including vocational testimony. *Id*. In *Poulous*, the record was "not fully developed" because of the lack of vocational evidence, whereas here, Plaintiff was "provid[ed]… with an opportunity to see the evidence on which the ALJ relie[d] and with an opportunity to challenge the ALJ's conclusion." *Id.* at 95 (referencing *Sykes v. Apfel*, 228 F.3d 259, 273). Further, in *Poulous*, the claimant faced a job-related limitation in that he could not sit on chairs built for a person of average weight; here, there are no medically established limitations with respect to Plaintiff's obesity on her ability to perform work.

Though Plaintiff only mentions her sleep apnea cursorily when contesting the residual functional capacity assessment, it is worth noting that the ALJ did, in fact, include a restriction that Plaintiff "must avoid concentrated exposure to extreme heat, extreme cold, humidity, wetness, dust, fumes, odors, gases, and poor ventilation." (R. at 30; *see also* Docket No. 9 at 9). Since Dr. Jain attributed Plaintiff's sudden sleep disruptions to "significant hay and… significant rhinitis," as discussed, the ALJ's environmental limitation was appropriate. (R. at 457). Moreover, the environmental limitation takes into account the opinions of the state agency physicians, which limited Plaintiff to avoiding concentrated exposure to "extreme cold, extreme heat, wetness, humidity, and fumes." (R. at 368 and 377). With this observation in mind, Plaintiff's allegation that the ALJ "downplayed the severity of Plaintiff's migraine headaches" is also defeated. (Docket No. 9 at 10). Dr. Peske considered Plaintiff's complaints regarding her

headaches and also determined that they were likely caused by exposure to environmental conditions. (R. at 457, 362). As addressed, in his medical source opinion from 2007, Dr. Peske noted that Plaintiff "describes a few frontal side and back headaches" that "seem… to be triggered by different odors." (R. at 362). When Plaintiff saw him in September 2008 for a headache in her right temporal area and around her eyes, Dr. Peske diagnosed her with allergic rhinitis and prescribed her Nasonex nasal spray and Loratidine. (R. at 430).

Furthermore, substantial evidence supports the ALJ's decision that Plaintiff's "moderate difficulties" with respect to concentration, persistence, or pace would not preclude her from performing light duty work. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). More weight should be given to the opinions of a treating physician because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Fargnoli*, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2)). The Third Circuit has consistently held that the "treating physician's opinion may be rejected only on the basis of contradictory medical evidence, although the opinion may be accorded more or less weight depending upon the extent to which supporting explanations are provided." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

The ALJ gave significant weight to the opinions of Plaintiff's primary care physician, Dr. Peske, because "he examined [her] frequently and had a longitudinal understanding of [her] condition." (R. at 35). "Where a treating source's opinion on the nature and severity of a

claimant's impairments is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record,' it will be given 'controlling weight.'" *Fargnoli* at 43 (quoting *Cotter*, 642 F.2d at 704)). Dr. Peske stated in his 2007 medical source opinion that Plaintiff is "not disabled" but she had been seen "quite frequently for various impairments." (R. at 359). When Plaintiff visited Dr. Peske on January 23, 2009 with a temporary disability form in hand, he declined to complete it, stating there was "no cause for disability." (R. at 426). In comparison to Dr. Peske's opinion, the ALJ gave less weight to the opinion of Dr. Bridges, as it was based on "only one encounter" with Plaintiff and "does not reflect a longitudinal understanding of her condition." (R. at 34). Nevertheless, the ALJ determined that the state agency physicians' opinions were more credible than that of Dr. Bridges, noting, "no other treating or examining medical source of record has found the degree of limitation endorsed by Dr. Bridges." (R. at 34). Both Dr. Heil and Dr. Rattan concluded that despite Plaintiff's limitations in understanding, carrying out, and remembering detailed instructions, she was still able to meet the basic mental demands of competitive work on a sustained basis, taking Dr. Peske's opinion into account. (R. at 372-74, 559-561). Further, the Court concurs that Plaintiff's self-reported activities "are inconsistent with an individual experiencing totally debilitating symptomatology." (R. at 32). Thus, the ALJ was entitled to give great weight to Dr. Peske's opinion and less weight to that of Dr. Bridges because his "is inconsistent with the totality of the evidence." (R. at 34).

In *Cotter*, the Court held that "[t]he ALJ has a duty to hear and evaluate all relevant evidence in order to determine whether an applicant is entitled to disability benefits." *Cotter* at 704. "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence he rejects and his reason(s) for discounting that evidence." *Fargnoli* at 43. He

must make enough factual findings so that the reviewing court has the ability to determine if "significant probative evidence was not credited or simply ignored." *Id.* at 42. Where a medical impairment that could reasonably cause the alleged symptoms exists, however, the ALJ must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work. *Hartranft,* 181 F.3d at 362. An ALJ must give great weight to a claimant's subjective description of his or her inability to perform even light or sedentary work when his or her testimony is supported by competent evidence. *Shaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999) (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979)). This requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it. *See* 20 C.F.R. § 404.1529(c). If an ALJ concludes that the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision. *Cotter* at 705. Ordinarily, courts defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess the witness's demeanor. *Reefer v. Barnhart*, 326 F.3d 376 (3d Cir. 2003).

That standard is met here because the ALJ heard and evaluated all relevant evidence and adequately explained the reasoning behind his credibility determinations, including Plaintiff's demeanor at the hearing demonstrating her ability "to respond to all questions asked… in an appropriate manner with no overt lapses in concentration." (R. at 29). The ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms." (R. at 32). However, he also determined that her statements concerning intensity, persistence and limiting effects were not credible to the extent they were inconsistent with the residual functional capacity assessment, discussed above. (*Id*.). Thus, substantial

evidence adequately supports the ALJ's determination with respect to Plaintiff's residual functional capacity to perform work, subject to the medically established limitations.

### C. Hypothetical Question

If a claimant has satisfied Step Four, the burden shifts to the ALJ at Step Five to show that there are a significant number of jobs available in the national economy that the claimant could perform. 20 C.F.R. § 404.1566(a). "Advisory testimony from a vocational expert is often sought by the ALJ for that purpose." *Rutherford*, 399 F.3d at 551 (citing *Plummer*, 186 F.3d at 428). This testimony "typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). Normally, a hypothetical question asks the expert to assume a person has certain physical capabilities, is able to do certain jobs, and the extent to which such jobs exist in the national economy; to be considered for purposes of determining disability, the question must accurately portray "the claimant's individual physical and mental impairments." *Podedworny*, 745 F.2d at 218.

The Court of Appeals has held that a hypothetical question "must reflect all of a claimant's impairments." *E.g. Rutherford* at 554; *Burns*, 312 F.3d at 123; *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). However, *Rutherford* cautions that this requirement not be misinterpreted: "all" of a claimant's impairments should be read as those that are *accurately portrayed* by the record. *Rutherford* at 554. Plaintiff argues that it was error for the ALJ to not include "all of [her] impairments in his hypothetical questions to the vocational expert." (Docket No. 9 at 3). However, Plaintiff's argument fails because the ALJ has no duty to include all of a claimant's impairments in a hypothetical question; the ALJ must only include those that are medically established. *Rutherford* at 554. "And that in turn means that the ALJ must accurately

36

convey to the vocational expert all of a claimant's *credibly established limitations.*" *Id.* (citing *Plummer*, 186 F.3d at 431). For the following reasons, the Court finds that the ALJ's question to the vocational expert accurately encompassed all of Plaintiff's medically established limitations.

Plaintiff claims that the ALJ's decision is not based upon substantial evidence because he "failed to submit questions concerning Plaintiff's illiteracy and borderline intellectual functioning to the vocational expert for her consideration." (Docket No. 9 at 3-4). The Commissioner responds that Plaintiff is "mistaken in this contention," as the ALJ considered her illiteracy and history of special education "when he included in the hypothetical question a specific limitation that did not require reading… and a limitation to simple, routine, unskilled work that involved low stress and no fast-paced production." (Docket No. 11 at 8). The Court will first address Plaintiff's reading limitation, since it is the most easily disposed of.

There is simply no merit to Plaintiff's contention that her "illiteracy" was left out of the hypothetical. (Docket No. 9 at 10). The record unequivocally reflects that the ALJ addressed Plaintiff's reading limitation in his question to the vocational expert. (R. at 30, 76). Puzzlingly, Plaintiff herself acknowledges that the ALJ's question included a stipulation that Plaintiff be limited to jobs with no reading, as she cites to this exception in her Brief: *"With regard to the Plaintiff's mental impairments, the ALJ found that… the Plaintiff is limited to jobs that do not require reading comprehension. (R. at 30)."* (Docket No. 9 at 13). As to her allegation regarding her "borderline intellectual functioning," there is no such diagnosis in the record, and to characterize her limitation of a "learning disability" as such would go against the credibly established medical evidence. *Rutherford* at 554. Specifically, her Brief references Plaintiff's testimony regarding special education classes, adding that school records show she was in "learning disabled classes." (Docket No. 9 at 10). However, the evidence does not support a

finding that Plaintiff's history of special education affects her ability to perform unskilled work, subject to the limitations established by the record. Returning to the Court's reasoning behind the rejection of Plaintiff's earlier arguments regarding the Listings and RFC, no physician of record has stated that Plaintiff is disabled, nor has any indicated that Plaintiff is unable to work. On the contrary, Dr. Peske noted in his 2009 report that Plaintiff seems to suffer from a lack of motivation, rather than an inability to hold a job. (R. at 545). Moreover, the state agency psychologists noted that Plaintiff's limitations with regard to concentration, persistence, or pace would not prevent her from meeting the basic mental demands of competitive work on a sustained basis, despite the moderate limitations resulting from her impairments. (R. at 374, 561).  As discussed, the ALJ was entitled to make the credibility determination to place less weight on the opinion of Dr. Bridges because of its inconsistency with the totality of the evidence. However, even Dr. Bridges found that Plaintiff was able to meet the mental demands of understanding, remembering, and following short, simple instructions and making simple work-related decisions. (R. at 557). These restrictions were included in the ALJ's hypothetical when he included a limitation of "simple, routine, low stress tasks with no deadlines or fast-paced production." (R. at 30). As for Plaintiff's "moderate limitations" with respect to interacting with the public, coworkers, and supervisors, the ALJ included an exception that there be no "teamwork-type" work and "no interaction with the public and only occasional interaction with coworkers and supervisors." (R. at 30; *see also* R. at 557).

Incorporated in Plaintiff's argument regarding the residual functional capacity assessment with respect to her obesity is that her "severe obesity condition should have been submitted to the vocational expert for her consideration about Plaintiff's ability to do less than the full range of light and sedentary work." (Docket No. 9 at 9 (citing SSR 02-1p)). Because Plaintiff's residual

functional capacity to perform light and sedentary work is supported by substantial evidence, it follows under *Rutherford* that the ALJ's hypothetical question should have included all credibly established limitations. *Rutherford* at 554. Turning to the record, the ALJ clearly included all of Plaintiff's medically established limitations in his hypothetical question. The ALJ states, "[i]f the claimant had the residual functional capacity to perform the full range of light work, a finding of 'not disabled' would be directed…" (R. at 36). However, he stipulates to the medically established limitations that "impede" Plaintiff's ability to perform the full range of light work. (*Id.*). Therefore, he asked the vocational expert hypothetical questions "to determine the extent to which these limitations erode the unskilled light occupational base" considering Plaintiff's age, education, work experience, and residual functional capacity. (*Id.*).

The hearing transcript reflects the fact that the ALJ determined Plaintiff's residual functional capacity based on the medically established evidence. (R. at 75-76). He asked the vocational expert to consider a person who, in addition to Plaintiff's age, education, training and work experience had the residual functional capacity to perform light work, except that she must avoid concentrated exposure to extreme heat, extreme cold, humidity, wetness, dust fumes, odors, gases, and poor ventilation. (*Id.*). This hypothetical was supported by the environmental limitations established in her residual functional capacity assessments, as well as the medical evidence of Plaintiff's asthma and allergies. (*Id.*). Further, the limitation of simple, routine, low stress work without deadlines or fast-paced production adequately encompassed Plaintiff's medically determinable learning disability. (*Id.*). The restriction of "no interaction with the public and no more than occasional interaction with co-workers or supervisors, and no teamwork" further supported Plaintiff's claims regarding mild limitations on her social

functioning. (*Id.*). And, as addressed, a requirement of "no reading" was included to address Plaintiff's claim that she was illiterate. (*Id.*).

As a final note, Plaintiff's characterization of the vocational expert's testimony as "opinions that the Plaintiff can do alternate sedentary and light duty work" is incorrect. (Docket No. 9 at 3). The vocational expert does not render an opinion regarding a claimant's capacity for work; the expert presents testimony on which an ALJ may rely in the *ALJ's* determination of whether a claimant can work. "The vocational expert's testimony… in response to a hypothetical that fairly set forth every credible limitation established by the physical evidence… can be relied upon as substantial evidence supporting the ALJ's conclusion [that the claimant is not disabled]." *Plummer*, 186 F.3d at 431 (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). Where the vocational expert testifies that the claimant is capable of performing work, and that those jobs exist in significant numbers, "[t]his satisfies the ALJ's burden of establishing there are jobs available which the claimant can perform given her 'severe' disability." *Plummer* at 431; 20 C.F.R. § 404.1566(a). Here, the vocational expert's testimony "fairly set forth every credible limitation" established by the evidence where she identified jobs existing in significant numbers that a person with Plaintiff's limitations could perform. Thus, the ALJ satisfied his burden at Step Five of the analysis. As a result, the Court finds that the decision of the Commissioner is supported by substantial evidence.

## VI.   CONCLUSION

Based on the foregoing, the decision of the ALJ is adequately supported by substantial evidence from Plaintiff's record within the meaning of 42 U.S.C. § 405(g). Therefore, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is

GRANTED. Accordingly, the decision of the Commissioner is AFFIRMED. Appropriate Orders follow.


s/ Nora Barry Fischer
Nora Barry Fischer
United States District Judge


Date:       September 14, 2012

cc/ecf:     All counsel of record.